UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AARON GARMAN,

                Plaintiff,

     v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

                Defendant.

CASE NO.    C05-5076FDB

REPORT AND
RECOMMENDATION

Noted for December 9, 2005

Plaintiff, Aaron Garman, has brought this matter for judicial review of the denial of his application for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is twenty-seven years old.[1] Tr. 59.  He has an eleventh grade education and no vocationally relevant past work experience. Tr. 22, 106, 111.

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

Plaintiff filed an application for SSI benefits on August 22, 2001, alleging disability as of September 1, 1993, due to anxiety attacks and attention deficit hyperactivity disorder ("ADHD") causing an inability to focus. Tr. 21-22, 59, 100–01, 105.  His application was denied initially and on reconsideration. Tr. 59-61, 66. Plaintiff requested a hearing, which was held on September 11, 2003, before an administrative law judge ("ALJ"). Tr. 30.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a lay witness and a vocational expert. Tr. 30-58.

On November 26, 2003, the ALJ issued a decision determining plaintiff to be not disabled, finding in relevant part as follows:

(1)     at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had a "severe" impairment consisting of an anxiety disorder;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)     at step four, plaintiff had the residual functional capacity to perform simple and routine tasks with limited contact with the public and co-workers, and had no past relevant work; and

(5)     at step five, plaintiff could perform other jobs existing in significant numbers in the national economy.

Tr. 28-29.  Plaintiff's request for review was denied by the Appeals Council on January 12, 2005, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R. § 416.1481.

On January 28, 2005, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1).  Specifically, plaintiff argues that decision should be reversed for an award of benefits for the following reasons:

(a)     the ALJ failed to consider all of plaintiff's severe impairments;

(b)     the ALJ erred in assessing the opinions of the non-examining consulting psychologists in the record;

(c)     the ALJ erred in evaluating plaintiff's credibility;

(d)     the ALJ failed to consider the lay witness evidence in the record;

(e)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(f)     the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

The undersigned agrees that the ALJ erred in determining plaintiff to be not disabled, but, for the reasons

1  set forth below, recommends that this matter be remanded to the Commissioner for further administrative

2  proceedings.  While plaintiff also has requested oral argument in this matter, the undersigned finds such

3  argument to be unnecessary here.

## DISCUSSION

5        This court must uphold the Commissioner's determination that plaintiff is not disabled if the

6  Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

7  support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

8  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

9  v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

10  a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

11  1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

12  one rational interpretation, the court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d

13  577, 579 (9th Cir. 1984).

14  I.     The ALJ Properly Considered Plaintiffs Severe Impairments

15        To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step

16  sequential evaluation process. 20 C.F.R. § 416.920.  At step two, the ALJ must determine if an impairment

17  is "severe".  Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or

18  physical abilities to do basic work activities. 20 C.F.R. §§ 416.1520( c), 416.920(a); Social Security Ruling

19  ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to

20  do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

21        An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

22  than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

23  Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

24  has the burden of proving that her "impairments or their symptoms affect [her] ability to perform basic work

25  activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

26  601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used

27  to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

28        Plaintiff argues the ALJ erred in finding his ADHD not severe and failing to address his diagnosed

personality disorder.  The medical evidence in the record regarding plaintiff's mental health impairments is fairly limited.  On October 20, 2001, plaintiff was evaluated by Dr. Rogelio Zaragoza, who diagnosed him with ADHD and a global assessment of functioning ("GAF") score of 60. Tr. 163.  In terms of plaintiff's mental status examination, Dr. Zaragoza found him to be neat and well-groomed, with good eye contact and normal speech. Tr. 162.  While he was "fidgety" and anxious, his thought processes were organized, and he denied having any suicidal or homicidal ideation, illusions or paranoia. Id.

Plaintiff also was alert and oriented, with intact memory and fair abstract thinking, judgment and insight. Tr. 162-63.  He was able to concentrate. Tr. 163.  Dr. Zaragosa believed that plaintiff's problem was treatable, that he had a fair likelihood of recovery, and that he should see improvement within the next twelve months. Id.  In terms of plaintiff's functional capacity, Dr. Zaragoza opined as follows:

> The claimant is capable of managing his funds.  He is currently handling his finances.  He has the ability to perform simple and various tasks and also difficult and complex tasks.  He is able to accept instructions from supervisors and interact with coworkers in the public.  He appears to be able to perform work activities consistently and maintain regular attendance in the workplace.  He appears to be able to deal with usual work related stress at this time.

Id.

A psychiatric review technique ("PRT") form and a mental residual functional capacity assessment ("MRFCA") form were completed by John Robinson, Ph.D., and Christina Booth, SDM II, on October 31, 2001.  The findings in both forms were affirmed by Carla van Dam, Ph.D., on April 29, 2002. Tr. 164-66, 168-80.  In the psychiatric review technique form, plaintiff was diagnosed with the following conditons: ADHD, with mild memory impairment and mild emotional lability and impairment in impulse control; an anxiety disorder, with mild social phobic traits; and a personality disorder, with avoidant traits. Tr. 169, 173, 175.  Plaintiff further was found to have mild restrictions of activities of daily living, moderate difficulties in social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. Tr. 178.

The MRFCA form contains a "summary conclusions" section, which lists various mental functional capacity areas and boxes that can be marked to indicate the appropriate level of limitation in the particular area, if any. Tr. 164-65.  In this section, boxes indicating plaintiff had moderate limitations in his ability to perform the following were checked: understand, remember and carry out detailed instructions; maintain attention and concentration; work in coordination with or proximity to others; complete a normal workday

and workweek; perform at a consistent pace; interact appropriately with the general public; accept instructions; respond appropriately to criticism from supervisors; get along with co-workers or peers; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Id.

The MRFCA form also contains a "functional capacity assessment" section, in which clarification or elaboration of the limitations indicated in the "summary conclusions" section are to be written. Tr. 166. In this section, plaintiff was deemed "capable of simple, unskilled work," based on his ADHD and anxiety. Id. He was thought to do best working with his hands, and to need the "steps laid out for him" due to "decreased concentration." Id. Plaintiff was found to be capable of handling "modest social demands," but it was felt he would do best with "only incremental public contact" and "a small number of co-workers," again due to his ADHD. Id. Finally, it was believed plaintiff's ADHD and anxiety caused him to have "some difficulty adapting to changes" and "making independent plans." Id.

Plaintiff was evaluated again in early November 2002, by Kristine S. Harrison, Psy.D. Plaintiff was pleasant, cooperative, appropriately dressed, "seemed to understand directions," and "worked calmly and persistently on tasks, even those that appeared challenging." Tr. 183-84. He was alert and oriented in all spheres, and, while his judgment "varied," his memory, fund of information and abstract reasoning were adequate. Tr. 185. Although his affect was "somewhat restricted" and he appeared "guarded in some of his responses," plaintiff described his mood as "good," his speech rate and content were normal, and there was no evidence of a thought disorder or abnormal motor activity. Id. Plaintiff also denied any problems with hallucinations, delusions, paranoia, or manic or hypomanic episodes. Id. He further denied any history of depressed mood or suicidal or aggressive ideation. Id.

On intellectual and cognitive functioning testing, plaintiff scored in the average or higher ranges, including with respect to attention and concentration. Tr. 186. Personality testing, however, reflected the presence of a social phobia "at a fairly high level." Tr. 187. Based on such testing and the mental status examination, Dr. Harrison opined as follows:

> Currently, his attention/concentration appears to be improved, although he continues to experience difficulty maintaining his attention on tasks that do not interest him. In my opinion, he no longer meets the diagnostic criteria for attention deficit/hyperactivity disorder, but may carry some mild residual of earlier attention problems. It is important that his current and past attention limitations may be associated with anxiety rather than a separate cognitive disorder such as ADHD; these disorders are sometimes difficult to

1   differentiate. . . .

2       In my opinion, Mr. Garman meets the diagnostic criteria for a social anxiety
        disorder/social phobia.  It is possible that Mr. Garman has developed some problematic
3       personality traits.  It can be difficult to separate personality features from anxiety in a
        one-time assessment such as this; it may be helpful to continue to consider persistent
4       personality traits that may underlie and sustain Mr. Garman's anxiety.

5   Tr. 188.  Thus, Dr. Harrison diagnosed plaintiff with a social anxiety disorder/social phobia, a mathematics

6   disorder, and a GAF score of 55 to 60.  Id.  Dr. Harrison also recommended that plaintiff expand his mental

7   health treatment, be counseled regarding obtaining his general equivalency diploma, and receive vocational

8   or work search counseling or training. Tr. 189.

9       The record also contains letters from , Maribeth Flood, A.R.N.P., M.S., to whom plaintiff had been

10  referred "for medication management for anxiety/ADHD." Tr. 194.  In late April 2002, Ms. Flood wrote

11  that he was "currently being stabilized on as much medication as he is willing to take, but is still unable to

12  function effectively enough to return to school or seek employment on his own." Id.  She also stated that

13  she had "returned him" for "more current vocational testing and additional specific counseling to pursue

14  employment." Id.  In late July 2003, Ms. Flood wrote that plaintiff had "just completed and passed the first

15  of the GED tests," that he planned to schedule the next such test that month, "with the rest to follow," and

16  that he was investigating employment opportunities through family contacts. Tr. 193.

17      There is also a letter in the record dated September 20, 2001, to the state department of disability

18  determination services, from Theresa Kelso, M.S.W., B.C.D., who diagnosed plaintiff with an anxiety

19  disorder. Tr. 160.  She thought that "income support for a limited amount of time would be useful," but

20  only if plaintiff continued "with counseling and medication" and moved "toward participation in some sort

21  of vocational assistance program." Id.  A letter from his vocational rehabilitation counselor, Kathleen H.

22  Brown, dated August 15, 2003, is in the record as well.  That letter reads in relevant part:

23      I am closing your file since you have not been able to establish a vocational goal with the
        assistance of DVR.  It does not appear that you are ready for vocational planning at this
24      time.  I recommend that you complete your GED, take a career planning class, and
        reapply for DVR services when you have determined at least a general area of
25      vocational interest.

26  Tr. 158.

27      The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

28  medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

1   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

2   ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

3   be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.

4   1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

5   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

6   "falls within this responsibility." Id. at 603.

7        In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

8   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

9   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

10  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

11  Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

12  ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

13        The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

14  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

15  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

16  legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

17  ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

18  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

19  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

20  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

21        In general, more weight is given to a treating physician's opinion than to the opinions of those who

22  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

23  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

24  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

25  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

26  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

27  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may

28  constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

31; Tonapetyan, 242 F.3d at 1149.

REPORT AND RECOMMENDATION
Page - 7

With respect to plaintiff's ADHD, the ALJ found as follows:

> I do not find that the claimant has a severe attention deficit disorder. Dr. Harrison is the psychologist who has examined the claimant most recently. She administered appropriate tests and determined that the claimant no longer qualified for this diagnosis. As the claimant is able to concentrate on reading for an hour at a time, enjoys fishing and hunting, and has been able to concentrate to take and pass at least one of the GED tests, I concur with her findings.

Tr. 25. Plaintiff argues that the fact that Dr. Harrison found improvement in his ADHD nine years after he alleges his disability began, indicates that he had a severe impairment during the relevant time period from which to improve in the first place. Just because plaintiff may have suffered from ADHD prior to the date Dr. Harrison conducted her evaluation, does not in itself mean it constituted a "severe" impairment at any time during that period. Indeed, other than plaintiff's own report (Tr. 161), there is no documentation of a diagnosis of ADHD in the record dated any earlier than July 2001. Tr. 194.

Plaintiff also argues that Dr. Harrison's opinion does not reasonably lead to a conclusion that his ADHD has not been severe. The fact is, however, the mental status examination and psychological testing administered by Dr. Harrison revealed fairly benign results. Tr. 185-88. While Dr. Harrison did note that plaintiff continued to experience some difficulties maintaining attention on tasks that did not interest him (Tr. 188), this appears to be based more on plaintiff's own self-report (Tr. 185). In any event, Dr. Harrison concluded that he "may carry some mild residual of his earlier attention problems," thus indicating that he did not feel this issue to be particularly significant. Id.

Other evidence in the record, furthermore, supports the ALJ's findings on this issue. It is true that Dr. Robinson and Dr. van Dam diagnosed plaintiff with ADHD, which, along with his anxiety, they found resulted in a number of moderate mental functional limitations. Tr. 164-66, 169, 173, 175, 178. Their findings, however, appear to be based solely on their review of the evaluation performed by Dr. Zaragoza, and plaintiff's own reports regarding his symptoms of anxiety as reported to Ms. Kelso. Tr. 160-63, 180. Although Dr. Zaragoza diagnosed plaintiff with ADHD as well, he essentially found no mental functional limitations resulting from that condition. Tr. 162-63.

While it is true that the opinion of a non-examining physician may constitute substantial evidence if "it is consistent with other independent evidence in the record," the only other evidence in the record that the limitations found by Drs. Robinson and van Dam are consistent with is the statement contained in the April 2002 letter provided by Ms. Flood. Tr. 164-65, 194; Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d

at 1149.  Ms. Flood, however, is not an "acceptable medical source."  See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 416.913(a), (d).  As such, her opinion also is entitled to less weight than those of Dr. Zaragoza and Dr. Harrisson.  The undersigned thus finds the ALJ did not err in determining plaintiff's ADHD to be non-severe.

With respect to plaintiff's personality disorder, once again, only Drs. Robinson and van Dam found that he had such a disorder. Tr. 175.  As noted above, however, their opinions are entitled to less weight than those of Dr. Zaragoza and Dr. Harrison.  Dr. Zaragoza, on whose opinion Drs. Robinson and van Dam based theirs, never diagnosed plaintiff with a personality disorder. Tr. 163.  While Dr. Harrison did state that it was "possible" that plaintiff had developed "some problematic personality traits," he too declined to provide that diagnosis. Tr. 188.  Although Dr. Harrison felt it might be helpful to consider any such traits that might underlie plaintiff's anxiety (Id.), this does not amount to a finding of impairment.  Accordingly, the undersigned finds the ALJ also did not err in failing to address this issue specifically.

II.    The ALJ Did Not Err in Evaluating the Opinions of the Non-Examining Consulting Psychologists in the Record

Plaintiff argues that the ALJ improperly rejected the mental functional limitations set forth in the MRFCA form found by Dr. Robinson and Dr. van Dam.  With respect to those limitations, the ALJ found as follows:

> I have considered the questions from the claimant's attorney concerning the moderate limitations set forth in Exhibit 3F [the MRFCA form], but I have applied the actual Functional Capacity Assessment from this exhibit and not the summary conclusions.  The assessment explains why the summary categories were marked and is more specific to the specific limitations experienced by the claimant.

Tr. 26.  Plaintiff asserts this reason is insufficient, as fails to take into consideration all of the limitations he was found to have by the two non-examining consulting physicians.

First, the undersigned finds the ALJ did properly analyze the limitations set forth by Drs. Robinson and van Dam.  The MRFCA form states that the summary conclusions section "is for recording summary conclusions derived from the evidence in [the] file." Tr. 164.  A "[d]etailed explanation of the degree of limitation for each category" in that section, "as well as any other assessment information" that is deemed appropriate, however, "is to be recorded" in the functional capacity assessment section. Id.  The functional capacity assessment section, furthermore, asks for "any information which clarifies" the limitations that are checked-off in the summary conclusions section. Tr. 166.

Had no elaboration or clarification been provided in the functional capacity assessment section, the undersigned would agree with plaintiff.  In this case, however, it was noted in that section that plaintiff was capable of "simple, unskilled work," and that he would "do best" with "only incidental public contact" and "a small number of co-workers." Id.  Although not all of the specific limitations set forth in the summary conclusions section were expressly addressed there, it was not unreasonable for the ALJ to find that the explanation contained in the functional capacity assessment section was a more accurate description of the opinions of Dr. Robinson and Dr. van Dam regarding plaintiff's limitations.

Indeed, placing greater reliance on the findings contained in the functional capacity assessment section would appear to be more in line with the Ninth Circuit's preference for individualized medical opinions over "check-off" reports. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983).  In any event, where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ, and, in such cases, "the ALJ's conclusions must be upheld." Sample, 694 F.2d at 642.; Morgan, 169 F.3d at 601.  Here, the ALJ's evaluation of the limitations found by Dr. Robinson and Dr. van Dam was rational, and therefore will be upheld.

Plaintiff argues that the ALJ's reliance on the functional capacity assessment section is especially problematic, as it is evident this section was written by a non-acceptable medical source, i.e., Ms. Booth, based on the three signatures that appear on that page. See Tr. 166.  The court, however, nor any of the parties as far as the undersigned is aware, is an expert in analyzing handwriting.  Any ruling in this matter based on such an analysis, therefore, would be inappropriate.  Even accepting plaintiff's argument that the functional capacity assessment section was written by a non-acceptable medical source, plaintiff's point is moot, as both Dr. Robinson and Dr. van Dam adopted the statements contained therein.  Lastly, plaintiff argues that the ALJ merely picked and chose which limitations from the report to adopt.  However, the findings contained in the functional capacity assessment section, which, as discussed above, elaborate on and clarify the limitations checked in the summary conclusions section, essentially comport with the ALJ's own residual functional capacity assessment. See Tr. 26.

The weight of the medical evidence in the record, furthermore, supports the ALJ's findings on this issue.  For example, Dr. Zaragoza did not find any of the mental functional limitations adopted by Drs. Robinson and van Dam, even though his evaluation provided much of the basis for their findings. Tr. 161-

63, 180.  Similarly, although Dr. Harrison found plaintiff had "some mild residual" of his "earlier attention problems," her findings also generally comport with the limitations set forth in the functional capacity assessment section of the MRFCA form adopted by Dr. Robinson and Dr. van Dam. Tr. 188-89.  Although, as discussed above, Ms. Flood felt plaintiff could not seek employment on his own (Tr. 194), Dr. Zaragoza and Dr. Harrison are both examining psychologists, and thus their opinions regarding plaintiff's functional limitations are entitled to greater weight.

III.    The ALJ Properly Evaluated Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample, 694 F.2d at 642.  The court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester, 81 F.3d at 834 (9th Cir. 1996).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

The ALJ provided the following reasons for discounting plaintiff's credibility:

I find the claimant to be generally credible, but I note that he is looking for work.  His major difficulty in working is in applying and interviewing for a job.  The jobs he has had have been through his friends and family.  He was able to work for McDonalds for a year, suggesting that he could persist at work.  Given his abilities as demonstrated on

testing with Dr. Harrison, the claimant will probably be able to accomplish what he sets his mind on.  However, at this point in his life, he has not been able to make up his mind what he wants to do, and it is for this reason that Vocational Rehabilitation has closed his file.  The claimant is able to play pool, football and basketball, all tasks that require knowledge of the rules and an ability to follow them.  He enjoys fishing and hunting, tasks that require long term attention and concentration.

Tr. 26.  The undersigned finds these reasons to be clear and convincing.

The ALJ properly may consider plaintiff's work record. Smolen, 80 F.3d at 1284.  Plaintiff argues that the only reason he is not working is because he lost jobs due to anxiety and concentration problems.  Plaintiff worked at McDonald's part-time for about a year taking orders and doing dishwashing. Tr. 162.  At the hearing, however, plaintiff testified that he left his job washing dishes at McDonald's, because they did not have enough dishes for him to wash and so they cut back on his hours. Tr. 44.  Thus, he did not see any point in continuing to work there. Id.  Plaintiff also told Dr. Zaragoza that he worked for two months full-time laying fiber optic cables during the summer of 2001, but "was laid off." Tr. 162.  Therefore, it appears that plaintiff left these jobs for reasons other than his mental impairments.

While plaintiff reported differently to Dr. Harrison (Tr. 184), this discrepancy in what he has told his examining psychologists, merely tends to further discount his credibility. See Smolen, 80 F.3d at 1284 (prior inconsistent statements concerning symptoms may be considered).  Plaintiff also argues that the McDonald's job he performed was only part-time, and not done at a level that is sufficient to constitute substantial gainful activity ("SGA").  Although that may be a relevant consideration at step one of the disability evaluation process, past work history, SGA or not, is a relevant consideration to take into account when assessing a claimant's credibility.

A determination that a claimant's complaints are "inconsistent with clinical observations" also can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  Here, the ALJ noted that psychological testing by Dr. Harrison indicated plaintiff would be able to "accomplish what he sets his mind on." Tr. 26.  Plaintiff argues that because he has never alleged a cognitive disorder, that testing cannot be relied on to discount his credibility.  Plaintiff, however, alleged that he had significant problems with attention and concentration, and testing revealed that he scored "in the high average range" in that area. Tr. 186.  As discussed elsewhere herein, furthermore, the weight of the medical evidence in the record supports the ALJ's finding that plaintiff is limited to simple and routine tasks with limited contact with the public and co-workers.

Plaintiff also takes issue with the ALJ's reliance on the fact that the state department of vocational rehabilitation closed his file.  Plaintiff's file, however, was closed not because of his anxiety symptoms, but apparently because he had "not been able to establish a vocational goal." Tr. 158.  This, despite the fact that it was recommended by all of plaintiff's treatment providers, as well as Dr. Harrison, that he pursue vocational rehabilitation assistance and counseling. Tr. 160, 189, 194.  Thus, it appears that plaintiff had issues of motivation and secondary gain, which the ALJ properly may consider in rejecting his symptom testimony. See Tidwell, 161 F.3d at 602; Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992).

The ALJ further discounted plaintiff's credibility in part due to activities he regularly participated in that required him to know and follow rules, pay attention and concentrate. Tr. 26. To determine whether a claimant's symptom testimony is credible, the ALJ also may consider his or her daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues the ALJ failed to consider that his mental impairments preclude him from being able to transfer those activities to a work setting, and that they were done only intermittently and not on a daily basis.  While the activities cited above by the ALJ likely in themselves are not transferrable to a work setting, they do indicate that plaintiff's difficulties with attention and concentration and alleged inability to focus are far less severe than he has claimed.  The record also indicates that plaintiff engaged in them on a fairly regular basis.  For example, plaintiff told Dr. Zaragoza in late October 2001, that during the summer "he did a lot of fishing and playing basketball and football." Tr. 161.  Even if it can be said, however, that this was not a proper basis for discounting plaintiff's credibility, the fact that one of the ALJ's reasons for discounting his credibility was improper, does not render the ALJ's credibility determination invalid, as long as it is supported by substantial evidence, as it is here. Tonapetyan, 242 F.3d at 1148.

Lastly, plaintiff argues the ALJ obfuscated the issue of his credibility by stating in the body of his decision that he found plaintiff "to be generally credible" (Tr. 26), and then subsequently stating in the "findings" section of the decision that he found plaintiff's "allegations regarding his limitations" to be "not

totally credible for the reasons set forth in the body of the decision" (Tr. 28).  Read as a whole, however, no serious argument can be made that the ALJ's decision contained any real inconsistency with respect to his credibility determination.  The ALJ's statement that he found plaintiff "to be generally credible, but" (Tr. 26), clearly indicates to the reader that the sentences that immediately follow will further limit that statement.  The undersigned thus finds there to be no material contradiction here.

IV.     The ALJ Erred in Evaluating the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues the ALJ failed to consider the testimony and written statements of his mother.  The undersigned agrees.  Indeed, the ALJ made no mention of the lay evidence provided by plaintiff's mother anywhere in his decision.  Defendant argues that any such error on the part of the ALJ was harmless, as it was non-probative in that it clearly conflicted with the evidence in the record as a whole. See Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ committed harmless error).  Such error may indeed have been harmless in light of the medical evidence in the record concerning plaintiff's impairments.  However, because, for the reasons set forth below, the undersigned finds that this matter should be remanded to the Commissioner for further administrative proceedings, on remand, the Commissioner also shall reconsider this lay witness evidence.

Plaintiff also argues in her reply brief that the ALJ failed to consider lay witness evidence provided by his sibling and by Ms. Kelso.  First, because plaintiff has raised this issue with respect to these two lay witnesses only in his reply brief, the undersigned finds it improper to address that issue here, except to note

1    that the ALJ did in fact consider the statement from Ms. Kelso (Tr. 26).  Thus, the undersigned declines to

2    find the ALJ erred with respect to the statements obtained from plaintiff's sibling and Ms. Kelso.

3    V.       The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

4            If a disability determination "cannot be made on the basis of medical factors alone at step three of

5    the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

6    assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

7    claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

8    his or her past relevant work, and at step five to determine whether he or she can do other work. Id.

9    Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

10           A claimant's residual functional capacity is the maximum amount of work the claimant is able to

11   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

12   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

13   limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

14   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

15   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

16   medical or other evidence." Id. at *7.

17           As noted above, the ALJ found plaintiff retained the residual functional capacity to "perform simple

18   and routine tasks with limited contact with the public and coworkers." Tr. 26.  Plaintiff argues that in doing

19   so, the ALJ failed to take into account many of the moderate mental functional limitations set forth in the

20   summary conclusions section of the mental residual functional capacity assessment form adopted by Drs.

21   Robinson and van Dam.  As discussed above, however, the ALJ did not err in relying on the findings

22   contained in the functional capacity assessment section of that form, which essentially comport with the

23   ALJ's assessment of plaintiff's residual functional capacity.  Accordingly, the undersigned finds the ALJ's

24   findings to be proper here as well.

25   VI.      The ALJ Erred in Finding Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

26           An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

27   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

28   1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

1   medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

2   Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

3   the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

4   description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

5   (because ALJ included all limitations that he found to exist, and those findings were supported by

6   substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

7          The ALJ posed a hypothetical question to the vocational expert containing the same limitations as in

8   his assessment of plaintiff's residual functional capacity. Tr. 54.  In response to that question, the vocational

9   expert testified that an individual with that residual functional capacity could perform the job of dishwasher

10  that plaintiff had done in the past. Tr. 54-55.  Based on the testimony of the vocational expert, the ALJ

11  found that the job of dishwasher existed in significant numbers in the national economy, and that therefore

12  plaintiff was not disabled at step five of the disability evaluation process. Tr. 27-28.

13         Plaintiff argues the hypothetical question posed to the vocational expert rendered the testimony of

14  that expert unreliable, because it did not include all of the moderate mental functional limitations contained

15  in the summary conclusions section of the MRFCA form adopted by Drs. Robinson and van Dam.  Again,

16  as discussed above, however, because the ALJ did not err in assessing plaintiff's residual functional

17  capacity, and because the hypothetical question contained the same work-related limitations, the ALJ did

18  not err in relying on the vocational expert's testimony.

19         Plaintiff further argues though that the ALJ erred in finding him capable of performing the job of

20  dishwasher.  This is because, plaintiff asserts, the ALJ limited plaintiff to simple routine and routine tasks,

21  whereas the Dictionary of Occupational Titles ("DICOT") defines that job to require the ability to perform

22  reasoning at a higher level.  Plaintiff also argues the ALJ did not explain this conflict between the DICOT

23  and the vocational expert's testimony, as the ALJ is required to do.  The undersigned agrees.

24         The DICOT defines the job of kitchen helper (DICOT 318.687-010)[2] as requiring "Level 2"

25  reasoning. See Plaintiff's Opening Brief, Exhibit B (Dkt. #10).  The DICOT defines Level 1 through 3

26  reasoning as follows:

27  _____

28      [2]The vocational expert did not testify at the hearing as to the particular DICOT number under which the job of
    dishwasher fell.  Defendant, however, has not objected to the job of "kitchen helper" chosen by plaintiff, and so the undersigned
    will adopt that number and corresponding definition as the appropriate one to consider here as well.

1    LEVEL 3

2    Apply commonsense understanding to carry out instructions furnished in written, oral,
     or diagrammatic form. Deal with problems involving several concrete variables in or
3    from standardized situations.

4    LEVEL 2

5    Apply commonsense understanding to carry out detailed but uninvolved written or oral
     instructions. Deal with problems involving a few concrete variables in or from
6    standardized situations.

7    LEVEL 1

8    Apply commonsense understanding to carry out simple one- or two-step instructions.
     Deal with standardized situations with occasional or no variables in or from these
9    situations encountered on the job.

10   DICOT, Appendix C.  Although not so expressly stated, plaintiff appears to argue that the limitation to

11   simple and routine tasks is analogous to "Level 1" reasoning, which would preclude him from being able to

12   perform the job of dishwasher, which requires Level 2 reasoning.

13        Defendant argues that the job of dishwasher has a specific vocational preparation ("SVP")[3] of 2,

14   which, according to SSR 00-4p, corresponds to unskilled work. SSR 00-4p, 2000 WL 1898704 *3.

15   Defendant further argues that plaintiff has not produced any evidence that he is incapable of performing

16   such unskilled work, which the Social Security Regulations define as follows:

17        Unskilled work is work which needs little or no judgment to do simple duties that can be
          learned on the job in a short period of time. The job may or may not require considerable
18        strength. For example, we considered unskilled jobs if the primary work duties are
          handling, feeding and off bearing (that is, placing or removing material from machines
19        which are automatic or operated by others), or machine tending, and a person can
          usually learn to do the job in 30 days, and little specific vocational preparation and
20        judgment are needed.

21   See 20 C.F.R. § 416.968.  Defendant's argument is unpersuasive.  First, in defining the terms separately, the

22   DICOT clearly distinguishes between a job's SVP level and the level of reasoning required to perform that

23   job.  See DICOT, Appendix C.  Indeed, a plain reading of the DICOT's definitions of these terms indicate

24   that they refer to two very distinct categories.  Second, the above definition of unskilled work does not

25   necessarily exclude the requirement that a worker be capable to following more detailed or complex

26   instructions, although the duties themselves may be "simple" or capable of being learned in a short period of

27

28        [3]The DICOT defines the term SVP to mean "the amount of lapsed time required by a typical worker to learn the
     techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."
     DICOT, Appendix C.

REPORT AND RECOMMENDATION
Page - 17

1    time, and it makes no mention of the term "routine."

2        Defendant next argues that the DICOT's definitions of Level 2 reasoning itself does not necessarily

3    preclude work involving simple and routine tasks.  However, the definition of Level 1 reasoning expressly

4    references "simple one- or two-step instructions," whereas the definitions of Level 2 reasoning clearly deals

5    with more "detailed" instructions involving a few to several "concrete variables."  It is true that the term

6    "detailed" is modified by the phrase "but uninvolved" in the definition of Level 2 reasoning.  The more

7    commonsense and logical reading of the DICOT's definitions of the above two levels of reasoning,

8    however, would indicate that Level 1 reasoning is much more analogous to the ability to perform simple and

9    routine work tasks than it is to Level 2 reasoning.

10        Defendant also argues that based on the DICOT's description of the duties involved in performing

11   the job of kitchen helper, plaintiff's limitation to simple and routine work does not preclude him from

12   performing that job.  Even if the undersigned were to ignore the fact that, as discussed above, the DICOT

13   defines that job as requiring Level 2 reasoning, defendant's arguments is still without merit.  According to

14   the DICOT, the job of dishwasher may involve all of the following tasks:

15        [A]ny combination of following duties to maintain kitchen work areas and restaurant
         equipment and utensils in clean and orderly condition: Sweeps and mops floors. Washes
16        worktables, walls, refrigerators, and meat blocks. Segregates and removes trash and
         garbage and places it in designated containers. Steam-cleans or hoses-out garbage cans.
17        Sorts bottles, and breaks disposable ones in bottle-crushing machine. Washes pots, pans,
         and trays by hand. Scrapes food from dirty dishes and washes them by hand or places
18        them in racks or on conveyor to dishwashing machine. Polishes silver, using
         burnishing-machine tumbler, chemical dip, buffing wheel, and hand cloth. Holds inverted
19        glasses over revolving brushes to clean inside surfaces. Transfers supplies and equipment
         between storage and work areas by hand or by use of handtruck. Sets up banquet tables.
20        Washes and peels vegetables, using knife or peeling machine. Loads or unloads trucks
         picking up or delivering supplies and food.
21
22   DICOT 318.687-010.  Although some of these tasks may in fact be simple and routine, many of the others

23   are not necessarily so, and certainly in combination, the tasks involved in the above job description appear

     to require more than just performing simple and routine work.
24
25        The ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts

26   between her testimony and information in the DICOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir.

27   1999); SSR 00-4p, 2000 WL 1898704.  Before relying on evidence obtained from a vocational expert to

     support a finding of not disabled, therefore, the ALJ is required to "elicit a reasonable explanation for any
28
     discrepancy" with the DICOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1.  Relying on

1   Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002), defendant argues the ALJ must explain a conflict with

2   the DICOT only where that conflict has been brought to the attention of the ALJ at the hearing.

3         The decision in Donahue, however, is not binding on this court.  In Donahue, the Seventh Circuit

4   analogized to the Federal Rules of Evidence to find that the ALJ is required to make the requisite inquiry

5   only when the basis of the vocational expert's conclusions is questioned at the hearing. Id. at 446-47.  The

6   Seventh Circuit also read SSR 00-4p to require the ALJ to "[e]xplain [in the] determination or decision how

7   any conflict [with the *Dictionary*] that *has been identified* was resolved." Id. at 446 (citing to SSR 00-4p)

8   (emphasis in the original).  However, the undersigned finds the reasoning put forth by the Tenth Circuit in

9   Haddock to be more persuasive.

10         In Haddock, the Tenth Circuit noted that the ALJ "has a duty to fully develop the record even when

11   the claimant is represented by an attorney." 196 F.3d at 1091.  This is in accord with the Ninth Circuit's

12   holding on this issue. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  The Tenth Circuit then

13   went on to state:

14           Questioning a vocational expert about the source of his opinion and any deviations from
             a publication recognized as authoritative by the agency's own regulations falls within
15           this duty.

16   Haddock, 196 F.3d at 1091.  The reasoning of the Tenth Circuit also appears to be much more in line with

17   the plain requirements of SSR 00-4p, which places an "affirmative responsibility" on the ALJ to ask the

18   vocational expert "about any possible conflict" between the evidence provided by the vocational expert and

19   the information provided in the DICOT, and, if there appears to be such a conflict, to "obtain a reasonable

20   explanation for the apparent conflict." SSR 00-4p, 2000 WL 1898704 *4.

21   VII.   This Matter Should Be Remanded For Further Administrative Proceedings

22         The court may remand a case "either for additional evidence and findings or to award benefits."

23   Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).  Benefits may be awarded where "the record has

24   been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan

25   v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

26           (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
             evidence, (2) there are no outstanding issues that must be resolved before a
27           determination of disability can be made, and (3) it is clear from the record that the ALJ
             would be required to find the claimant disabled were such evidence credited.

28   Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

REPORT AND RECOMMENDATION
Page - 19

The undersigned finds this matter should be remanded to the Commissioner to re-evaluate the lay witness evidence in the record from plaintiff's mother and to obtain additional vocational expert testimony regarding the apparent conflict between the vocational expert's testimony and the definition of kitchen helper in the DICOT. In addition, although the vocational expert only testified as to the ability of plaintiff to perform his past job of dishwasher, it is not clear from the record that there are no other jobs existing in significant numbers in the national economy that plaintiff can perform. Therefore, on remand, if the Commissioner finds plaintiff is unable to perform his past job as dishwasher, additional vocational expert testimony also shall be obtained to determine if there are other jobs existing in significant numbers in the national economy plaintiff can perform.

<u>CONCLUSION</u>

Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 9, 2005**, as noted in the caption.

DATED this 17th day of November, 2005.

Karen L. Strombom
United States Magistrate Judge